Good morning, Your Honors. May it please the Court. This is an arbitration case. The motion to compel arbitration that my client brought was heard by both the magistrate judge and the district judge, and they agreed in almost all respects. First of all, they agreed that all four of the plaintiffs had entered into valid arbitration agreements, two of them the 2010 agreement and two of them the 2014 agreement. They also agreed that Bluestem could enforce those agreements. And they also agreed that at least some parts of every claim were subject to arbitration order there. The place they diverged is that the district court thought some parts of some claims fell outside the scope of the arbitration agreement and should be litigated, whereas the magistrate judge concluded that all parts of all claims. We think the magistrate judge got it right here and the district court judge got it wrong. The real controlling point of law here is from the U.S. Supreme Court in the first Options v. Kaplan case, where it said, and this is from Justice Barham's majority opinion, it said once it's established that there is a valid arbitration agreement covering some claims in the dispute, the law insists on clarity before it will conclude that the parties wanted to exclude other claims from that as a matter of federal law. Here there isn't any clarity on excluding the claims that the district court brought out. In fact, the arbitration agreements use what this court has described as the broadest possible language you can reasonably use to describe the scope. And the actual claims, the way they're factually divided, aren't clean breaks. In fact, under the complaint that was pleaded, they aren't breaks at all. They're single combined claims. And so for this reason, our argument is that the court should finish the job, send all of the cases to arbitration, and therefore demand from the district court to do that. Where I'm going to start out on this is just this scope issue right now. And as your honors are aware, there are two different agreements at issue as the district court found it. We have an alternative argument that everyone was updated and amended to the 2014 agreement or the 2012-13. This court doesn't need to reach that issue in order to do what we did. You can resolve it just the way on the agreements that the district court and the magistrate both found were there. So under the 2014 agreement, the language, of course, is exceptionally clear. It says that the we and us who can invoke arbitration include any merchants that use the card to buy things from, which, of course, includes Fingerhut. And it also says that all claims include not just those arising out of or relating to the credit, but arising out of or related to the goods and services you purchase. And there just isn't any argument here, reasonable argument, that these claims don't fall in that. So let me turn to the 2010 agreement. Oh, go ahead, your honors. I'd like to keep you at the 2014. Yes. What do we do with the part at the beginning of that provision in the 2014, which is the and I think this is what the district court was relying on as well, disputes arising out of or relating to this agreement or our relationship. Does that limit, then, how you view the language that you just described? No, I don't think it does. And you're right, that's what the district court said. It said that that introductory language on this limits the later, more specific language. I don't think that's consistent with the ordinary canons of construction, which say that if there's something that's general and something more specific, the specific controls. And in this case, the part that we have cited is unambiguously clear, both about who can invoke it and about the scope. And so if you apply that general rule together with the binding rule of this court and the U.S. Supreme Court that all doubts have to be resolved in favor of arbitration and you can construe it broadly, unless you can say with positive insurance that it doesn't cover it, I think that's conclusive on this, your honors. What would the meaning of that initial phrase be, then, if it doesn't limit what follows to just either the agreement or our relationship? Like I said, your honor, I think this is a phrase that introduces the arbitration clause here. And it says, you know, by following the instructions below, you're agreeing that this is what's going to happen. And, of course, we agree, and everyone agrees, that the parties can choose to have any dispute arising out of or relating to this agreement or the relationship resolved by binding arbitration. That's certainly true. The later phrases here give meaning to that and flesh out exactly what it means. If you were to rely on the language as the district court did in relying on that, would you agree that the claims that are sort of freestanding about pricing that they allege wouldn't fall within the agreement or our relationship? No. So you're not depending entirely on the subsequent phraseology of what you read earlier, the credit, the goods, the services? You're right on that. And this is consistent with our view of what the 2012, 13, and 14 amendments did generally. They gave greater specificity to the broad scope that was already there in the 2010 agreement. We think it makes it unambiguously clear that the scope is broad here. But under this court's rules for interpreting the breadth of arbitration language, we think it's broad enough to include this even on the initial scope. And that's because, as we said, as the Supreme Court has said, the initial formation is governed by state contract law. Once it's concluded that there's a binding arbitration agreement, federal law and the policy under the Arbitration Act provides that you can construe it broadly. As your honors have held in the Unison case and others, the first question is, is this a narrow arbitration agreement or is this a broad one? And the language arising out of or related to makes it a broad one. And once you conclude that it's a broad one, the rule is anything that touches on the relationship on that is covered by the arbitration clause. The test for scope is not, as the other side has suggested, whether the plaintiffs need to rely on the contract terms to make their claim. That's a different issue. That's an issue about who can enforce it and enforceability. This court in the PRM case that we cited here from this court specifically says that in determining whether the scope of the clause is broad enough to cover the claims, we do not consider the fact that the defendant is not a party to the agreement. So the plaintiffs are confusing and the chief judge below, with respect, also confused the question of who can enforce and scope. They're different. And under the scope issues here, it's very broad. Do you have any other follow-up questions, Your Honor, on 2014? I do. I have plenty. Go ahead. I guess I'm also curious. It's sort of hard to talk about the parade of horribles sort of situation, but the district court did point out sort of where does this end. Can you help me understand why this particular claim, and let's assume that Chief Judge Juneau got it right, that there is this claim that's freestanding about the pricing. Can you help me understand why that falls within this, but maybe something else related to the goods that seems completely independent of the credit agreement might not? Or would it? I mean, is there any outer bounds to what would fall within this arbitration agreement? What are those limits? Yeah, I think there are a couple of different ways that this would be limited. Number one, it's limited by the kinds of parties who can enforce it. So Samsung and other manufacturers wouldn't be able to enforce this. They have no claim under this. And so that's one limiting principle. It's the who can enforce. Here, of course, the person enforcing it is Bluestem, who did business as Fingerhut. As the plaintiffs admit, Fingerhut was the one who offered them credit. It offered them that in order to buy products at Fingerhut. They allege in the complaint that Fingerhut was the creditor. And just to follow up a little bit, Your Honor, on your question on here, the allegation of plaintiffs is that Bluestem, Fingerhut was the creditor. Their allegation is that Fingerhut charged both things. Their allegation is that the prices were marketed as monthly charges. And so this is a closer integration of the sale of the product and credit than any case they've cited or that we've seen. Because this is the way it's packaged. And if you go down through their allegations, there aren't these separate claims for usury. That is something that the district court added that is not in the complaint. And logically, it doesn't make sense because usury, their claim is that when you add up the price to the disclosed finance charges, it exceeds the usury limits. What the district court has resulted is that in arbitration now, there's going to be the part of the claim where you say, yes, there was an undisclosed finance charge and that plus the disclosed one violated usury. So they're going to have to decide whether there's an undisclosed finance charge in arbitration. And then in litigation, the court's going to say, was there an undisclosed finance charge and it should be treated that way? And does it violate it on its own? So both forum are going to be considering precisely the same question, on the same facts, for the same claims, numbered as the same claims in the complaint. So to be clear, there is a greater overlap of claims here than in any case that they've pointed. In fact, they haven't cited any case drawing this line on scope that has sliced and diced like this and taken the claims apart. Well, let me push you a little bit harder on the question about what would be scope. Like, for example, or the goods or services you purchase, that's pretty broad. And so you're buying from this fingerhood, bluestem, items that are not manufactured by them. That's correct. So where is the limit on the goods and services in your view? Is there any limit on what would be arbitratable regarding the quality or damage of a product? Again, I think if they brought that claim against bluestem on there, that would clearly and unambiguously fall within the scope of this language. If they were to bring it against somebody else, there would be a strong argument that the somebody else wasn't embraced by this. But to address your point head on, what I hear Your Honor saying is there's concern here about interpreting this unreasonably broadly. And that concern can be addressed within a couple of ways. One is on the scope of consent and formation in the first place. That draws real limits on formation. Another is on the scope of who can enforce. That draws limits on there. And ultimately, there's limits drawn by the scope of the language and the reasonable interpretation on that. And in the appropriate case, this court would draw those limits and say, no, this falls outside. There isn't something like an overbreadth challenge to a contract, though, that applies where the actual claims in front of the court are so clearly in the middle of this relationship as these ones are. To the extent there was any such challenge like that to the legitimacy or the validity of the contract, the magistrate judge correctly held that all of those claims would have to go to the arbitrator because validity is one thing that's sent there. This is specifically in her report and recommendation at pages 63 and 67 in the addendum. It is not a portion of her report and recommendation that the plaintiff's challenged, so they waived that. So to the extent there's any feeling here that these are invalid or in some way defective, that is not before this court on that. What's before this court, as I said, is just scope. And so what the court is going to be doing here is not limited to this situation. It's going to apply generally to scope questions broadly and consistent with the court's binding precedent, we think, these fall within. Counsel, with regard to scope, what kind of claims would be covered by the 2014 credit agreement language that would not be covered by the 2010 language? It's an interesting question, Your Honor, and I haven't tried to go through and do the catalog on that. I suppose it's possible that pure product liability, things like that, might be, as Your Honor did. The claims in this case, we think, because they really do arise out of the credit, and the claim is that you disclosed part of the credit we were paying, but you didn't disclose the other part of the credit we were paying. Those are so bound up in there that we think they're covered by both. That's not an exhaustive catalog, Your Honor. There might be others. I reserve the remainder of my time. Thank you. Ms. Nichols, will you proceed? Good morning, and may it please the Court. My name is Leah Nichols, and I represent the appellees, Jessica Parm, Sarah Arce, Anne Bowers, and Nina Sorio. The district court's decision denying Bluestem's motion to compel arbitration in part should be affirmed because the scope of the bank's arbitration agreements is limited to disputes that arise out of or relate to the agreement, and the plaintiff's claims here do not arise out of or relate to the agreement. I want to start, as I think Judge Kelly was looking at earlier, with the 2014 agreement. We don't concede that the 2014 agreement applies to everyone, but Bluestem's position is that it's a bit broader, and so we'll start there. The first sentence of the agreement says that by accepting this agreement, you agree that either you or we, at our sole discretion, can choose to have any dispute arising out of or relating to this agreement or a relationship resolved by binding arbitration. That clause, arising out of or relating to this agreement, modifies dispute. I think that's pretty clear from the language. Going down, there's a discussion, and this is what Bluestem relies on, of what dispute means. Dispute is in quotation marks in the agreement. It says dispute shall be construed broadly and shall include any claim, dispute, or controversy arising from or relating to the agreement, the credit offered or provided to you, or the goods or services you purchase, or the actions of yourself, us, or third parties. That is just describing what the word dispute means. That doesn't eliminate, that doesn't write out the first sentence there, which says that the dispute must arise out of or relate to the agreement. What about the position that the agreement, the allegation or position, is that the Fingerhut charges more than another related website, correct? What's the percentage? It's a high 90s of Fingerhut customers that are actually using the credit. Why doesn't that just collapse this issue? In other words, there really aren't any Fingerhut customers who would fall in the category of the freestanding pricing complaint because they all use the credit, and so that it's just so intertwined you can't separate them out. To answer the factual question first, it's about 8% of the Fingerhut customers don't use the Fingerhut branded bank credit. The reason it doesn't collapse the claims is because you could take away the credit agreements here completely and their claims would be exactly the same. We do have that. You're not required to use their credit in order to purchase the products on Fingerhut. You can pay cash with a debit card. You can use a regular credit card that's not the Fingerhut branded credit card to make those purchases. Again, the claims would be the same. Whether or not the plaintiffs had entered into those agreements, the claims would be the same. Whether or not they had used that credit to make their purchases, the claims would be the same, regardless of whatever the terms of the credit were. I want to be absolutely clear here, is that our claims are that regardless of whether you consider the interest rate that's being charged by the banks, that the finance charges here are usurious. Let me ask you something about what you just said. If a customer uses their own credit card, then they have a cash sale. This is a cash sale. Yes. And so doesn't this claim go away? No, Your Honor. Well, first of all, to be very clear, that's a merits question, and that's not before the court here. I think I strongly suspect— Well, sure it is, because it goes to what's the dispute? What's the claim that's being asserted? The claim that's being asserted— And it seems to me if it's a cash sale, then this argument that by raising the price, you've built in additional interest, goes away. Now it's just a complaint about, well, you just charged too much for this. I can buy it cheaper somewhere else. Your Honor, Bluestem's own materials is very clear that it's the basis for its business practice here is to drive consumers who have low credit scores, who may be in need of credit, who are attracted by advertising that they can pay for something on a monthly basis, to the Fingerhut site versus the Gettington site where stuff is cheaper. This is an intentional choice. They use the phrase, we're going to take advantage of consumers who have low credit scores and poor credit scores, and we're going to send them to a website that's going to charge them exorbitant prices for these items. The claims in the complaint is that by advertising and targeting these products at these prices towards these consumers, that that's an undisclosed and usurious interest rate. And I also, again, want to be perfectly clear that our view is that those rates are usurious, regardless of whether they're compiled on with the interest rate that the banks are charging. So the banks are charging the 24.9%. Whether you count that or not, the Bluestem prices represent an undisclosed finance charge that's greater than the usury limits under any of the state's laws here. What about opposing counsel's position that maybe separating out these claims in your complaint is just not, if I'm hearing you correctly, that you really didn't allege two separate types of allegations, that it's really all related to the agreement or the credit? Right. It's not. And here's why. So in the complaint, what the complaint says is that they're both on top of the interest rate that banks are charging would be usurious and without it. And so the claims are, even without that, these additional fees are undisclosed and they're usurious. And to be also clear, the only actions that are disputed here are those of Bluestem. It's undisputed from the record. It's undisputed from the testimony of Bluestem's chief legal officer in her deposition that the banks have absolutely no influence on how Bluestem sets its pricing, what decisions it has about that. That is completely unrelated to the bank's credit agreement with the consumers. So here we're looking solely at what is Bluestem doing? It doesn't matter what the banks are doing here at all for the plaintiff's claims to proceed. I think it's worth looking at what the Eleventh Circuit has said about the limits of arising out of or relating to. The Eleventh Circuit has some pretty developed case law on this. So in telecom Italia, the Eleventh Circuit said that a claim, quote, relates to a contract when the dispute occurs as a fairly direct result of the performance of contractual duties. Here, the contractual duties that are in the credit agreement are between the consumers and the banks about paying off their monthly charges, paying their bills, that kind of thing. None of those contractual duties are disputed in this case. There's no allegation that the banks did anything wrong whatsoever. What do we do with the extra language in the 2014 agreement then? It is broad. Credit offered or provided, goods or services, actions, and it includes the merchants from whom you're purchasing. All of that, that's a pretty wide breadth. It is, but it's saying what dispute means. So again, disputes in quotation marks, and it says this is what dispute means. All of those things are the things that could be a dispute. But that doesn't negate the fact that the first sentence of the arbitration agreement says that by accepting this agreement, you agree that either you or we can choose to have any dispute arising out of relating to the agreement sent to arbitration. So to say that that language at the bottom is untethered from the first sentence is just to write out the first sentence of the agreement, and you need to interpret the contract as it's written. We can talk about how we interpret arbitration agreements. BlueStem has brought up a lot of that. We've argued about it in the briefs. But at the end of the day, what this court has always done was looked carefully at the language in the contract and not written out sections, but in fact looked at that language, whether you say you're applying federal law or state law. It always comes back. To elaborate a little bit on your question, Judge Kelly, you can imagine that what they're trying to encapsulate here is, so for example, if you have a dispute about whether BlueStem, for example, is the servicer of the credit accounts, if you have a dispute over whether BlueStem screwed up in the servicing of your credit account, that could be encapsulated by this. So there are things that still relate to arise out of the agreement that are encapsulated by that language and making clear that they're covered. But this is not a dispute that arises out of relating to that agreement. So I think they're just trying to make that clear. The other point – Let me go back to see if I fully understand your claim. I think I heard you say that your claim, the underlying claim here, you say you have the claim regardless of the interest rate. Regardless of the interest rate charged by the banks, yes. It's the increase in price. Yes. Okay. Now, let me go back to my earlier line of questioning. If a customer pays for it with a debit card, would that customer have the same claim? Our view is that, yes, they would have the same claim. How can they have the same claim when they haven't borrowed – they're not buying anything on credit? Your Honor – Excessive interest implies paying out or borrowing. You've charged me too much for the use of this money. Your Honor, it goes back to, again, the way that Bluestem targets and markets its products. That's part of the claim. Now, whether – and, again, I think whether or not the plaintiffs have made out a claim that can go forward under state law, for example, whether Bluestem is a creditor for purposes of the Truth in Lending Act and so on, is a merits question about whether the plaintiffs have stated a claim. And that's something that would presumably be addressed by the district court on remand. That's not before this court here. Well, I think it's important because if I'm correct and this claim that you've described can only exist if you, in effect, borrow money from the defendant by paying out over time, then it seems to me it has to relate to the credit agreement and then would be subject to arbitration. Your Honor, I disagree. I think the claims don't rely on that. And whether or not they have to go forward is a question on the merits on a motion to dismiss or a summary judgment motion. Yeah, my understanding, and to follow up to Shepherd's question, are the prices on Fingerhut just flat out higher than on Gettington? Yes. Even if I pay cash? Correct. So is that where you're – Yes, yes. And then they get even higher, is your allegation, at least in the complaint, that they get higher for Fingerhut because so many people use the credit? Yes. Right. And so if you look at the same products on Fingerhut versus Gettington, so let's say the doghouse that Jessica Parham bought, on Gettington it's available for $94.99. She paid $159.99 on Fingerhut for the same exact product, both of them offered by Bluestem. In Bluestem's own description of its business model, it says, you know, we are going to charge higher prices to people who have low credit scores. But does that $159.99 include the charges you're getting for the opportunity to pay for it month by month? The $159.99 does not include the 24.9% interest being charged by the banks, if that answers your question. So, yeah, so that's, again, you know, the revolving credit account that's at issue here. It works just like a credit card does. You can, you know, use it or you pay a certain minimum. If you don't pay it off, then you're subject to the APR of 24.9%. That's on top of the increased prices that Fingerhut offers. The other thing I'd like to note is that you can use the Fingerhut revolving credit, the Fingerhut branded revolving credit account at some retailers other than Fingerhut, too. And you won't be charged the higher markup price. And you can imagine there, so, for example, some of the types of things you can use it at Teleflora. You can use it to buy insurance. You can imagine all sorts of disputes about, say, insurance that aren't, that don't arise out of or relate to the credit agreement. Even though under, this goes back to how do we read the 2014 agreement, Bluesome's position is that the goods or services that disputes about the goods or services you purchase is untethered to the requirement that it arise out of or relate to the agreement. But you can easily imagine a situation where there's a dispute over, say, insurance, where the way you paid for it has nothing to do with that claim. And so the only sensible way to read it is to limit it in that way. If there are no further questions, I suppose. Thank you. Your Honors, let me follow up on the 2014 agreement first. That sentence, the first one, says it covers all claims arising out of or relating to either this agreement or our relationship. And our is defined to mean not just the bank, but the merchant. So it covers all claims arising out of the relationship between the customers like these plaintiffs and Bluestem Fingerhut. There is no textual gap between the first sentence and the later sentences. The plain language covers everything. The second point is that counsel referred to the Telecom Italia case to invoke a restricted interpretation of the scope of arbitration. That case involved a clause that had only the arising out of language, not the relating to. And the case made a big deal of that. The Penn site is 248 Fed Third at 1116. This agreement, both of them have the relating to language, which this court's binding precedent says is as broad as possible and covers everything that only touches on. The last point is that counsel is not being accurate about the way this complaint is claimed. First of all, the complaint is limited only to people who have credit agreements and bought on credit. It does not cover people who have cash. That's appendix page 7, paragraph 23 in PARM, appendix page 13, paragraph 42. This is an integrated product. The claims and the coverage apply to all of them. Thank you, Your Honors. Thank you, counsel. We appreciate your arguments this morning.